**Madeleine MOHALLEY, Plaintiff,**

v.

**The KENDALL HEALTH CARE PRODUCTS CO., INC., Defendant.**

**No. 5:94–cv–307–4 (WDO).**

United States District Court,
M.D. Georgia,
Macon Division.

Oct. 11, 1995.

Daryl James Morton, Macon, GA, James A. Burke, Santa Fe, NM, for plaintiff.

Margaret Hutchins Campbell, Atlanta, GA, G. Daniel Ellzey, Mason G. Alexander, Columbia, SC, for defendant.

## ORDER

OWENS, District Judge.

Before the court are motions for partial summary judgment on liability filed by plaintiff Madeleine Mohalley, and for summary judgment filed by defendant The Kendall Health Care Products Company, Inc. After careful consideration of the arguments of counsel, the relevant case law, and the record as a whole, the court issues the following order:

## FACTS

The facts in this case are not in issue, having been agreed to by stipulation between the parties. In November of 1985 The Kendall Health Care Products Company, Inc. ("Kendall"), purchased McGaw Laboratories, Inc., of Milledgeville, Georgia ("McGaw"), from American Hospital Supply Corporation. Plaintiff retired from Kendall's predecessor corporation, Kendall McGaw Laboratories, Inc., on or about July 28, 1986. During the time plaintiff was employed with Kendall McGaw Laboratories and its predecessors she was paid on an hourly basis.

Based upon her past employment plaintiff received certain benefits from McGaw at the time of her retirement. On or about June 3, 1986, she received a lump-sum payment of approximately $34,375.22 as a retirement benefit for her employment with American Hospital Supply Corporation from date of hire until November of 1985. On the same date she also received a lump sum payment of approximately $800.00 related to her employment with Kendall from November 1985 until July 1986. This represented her retirement benefits from the salaried employees' provisions of the retirement plan sponsored by Kendall.

As part of its Retiree Health Care Plan, Kendall offered its Medicare Supplement Plan (the Plan) to eligible retirees over the age of 65. Kendall determined that plaintiff was an eligible retiree under the following provisions:

All former active full-time employees and part-time employees who worked at least 60% of the normal work week and completed 10 years of continuous active employment are eligible to participate in the Medicare Supplement Plan provided they are at least age 65 and are eligible to receive a benefit under Kendall's defined benefit pension plan. Retirees who waived coverage under the Early Retiree Medical

Plan or whose coverage was terminated for any reason are not eligible to enroll.

Plaintiff subsequently began to pay and has continued to pay premiums required for her continued participation in the Plan.

From the date of her retirement until September 1, 1989, plaintiff's required premium for participation in the Plan was approximately $4.30 per month. This amount was uniformly applied to both hourly and salaried Kendall employees. However, on September 1, 1989, Kendall undertook to make several changes to its Retiree Health Care Plan. Included among the changes was the establishment of a two-tier premium schedule for two classes of eligible retirees. The proposed changes were set out in inter-office correspondence dated May 25, 1989, from Debra A. Weafer to various Kendall employees. The inter-office correspondence provided the following explanation for the changes to the Plan:

### PREMIUM CONTRIBUTIONS

Rates were set to provide greater Kendall support for medical premiums paid by hourly retirees. Rates were increased for early retirees to reflect an adjustment necessary to account for the much larger expense we incur to provide medical benefits for those who retire early and therefore are not eligible for Medicare. Such an adjustment, as you know, is also used to calculate pension plan benefits for those who retire early.

HOURLY RETIREES (Retirees who are receiving or who have received a pension benefit from the Hourly Pension Plan.)

| | Early Retiree Life Care Plan 300 | Medicare Supplement Plan |
|---|---|---|
| Retiree | $43.50 | $11.25 |
| Each Dependent | $43.50 | $11.25 |

SALARIED RETIREES (Retirees who are receiving or have received a pension benefit from the Salaried Pension Plan, as well as McGaw hourly and RCI retirees.)

| | Early Retiree Life Care Plan 300 | Medicare Supplement Plan |
|---|---|---|
| Retiree | $65.25 | $33.75 |
| Each Dependent | $65.25 | $33.75 |

In a letter from J. Dale Sherratt dated May 23, 1989, Kendall notified plaintiff that a premium increase would go into effect beginning September 1, 1989. However, plaintiff was not notified of the newly created retiree classifications. She was thus unaware that there were now two premium schedules or

that as an hourly McGaw employee she was nevertheless classified as salaried for purposes of the Medicare Supplement Plan. After being notified of the increased premium amount effective September 1, 1989, plaintiff was directed to pay and did pay the following amounts as premiums for her Medicare supplement coverage:

$33.75 a month from October 1989 to December 1990;
$43.50 a month from January 1991 to December 1991;
$57.00 a month from January 1992 to December 1992;
$64.00 a month from January 1993 to December 1993;
$73.00 a month from January 1994 to December 1994;
$88.00 a month for 1995.

The corresponding premium amounts for retirees classified as hourly employees were:

$9.40 a month from October 1989 to December 1990;
$14.50 a month from January 1991 to December 1991;
$19.75 a month from January 1992 to December 1992;
$25.00 a month from January 1993 to December 1993;
$31.00 a month from January 1994 to December 1994;
$37.00 a month for 1995.

On or about November 21, 1990, plaintiff received a letter addressed to her as "Dear Kendall Hourly Retiree." The letter advised her that hourly retirees would be required to pay $14.50 per month for continued participation in the Plan. She was informed shortly thereafter that this information was in error and that the correct amount was $43.50 per month. In her attempts to resolve the conflicting information, plaintiff became aware for the first time of the two classifications of retirees. After several telephone discussions with Kendall employees concerning the correct amount of her premium contribution, plaintiff wrote a letter on March 23, 1993, to Kerry Lynch, Kendall's Benefits Administrator. She stated in the letter, "I would like you to send me a copy of the procedure which gives details of this decision—when it was adopted, by whom, who is affected by it, and whatever other information is given in this document. This will help lessen my confusion if any more billing mistakes are made." On April 23, 1993, Ms. Lynch informed plaintiff by letter that all employees of McGaw Laboratories were considered salaried for all benefit purposes and advised her that "[b]eing considered salaried was advantageous in respect to short-term disability, long-term disability and the pension plan."

On May 26, 1993, plaintiff's retained counsel again wrote Ms. Lynch requesting that

within the following fourteen days she provide any documentation by which Kendall has made a determination that all employees "were considered salaried." On August 4, 1993, plaintiff's attorney wrote Larry Schilmeister of Kendall again requesting copies of the documents "proving the assertion from the 1986 retirement of Mrs. Mohalley that there was always one category of retirees." On August 27, 1993, counsel wrote Mr. Schilmeister stating that he had not heard from him since his letter of August 4, 1993, and indicating that he looked forward to receiving copies of the appropriate documents. On October 28, 1993, Ms. Lynch advised plaintiff's counsel by letter that:

> All Kendall–McGaw employees, including those in Milledgeville, received pension benefits based on their salary, regardless of how they might be classified for accounting purposes. Since Ms. Mohalley was a Kendall–McGaw employee, she received a salary-based pension benefit, as shown on the copy of her pension calculation worksheet that I have enclosed. Therefore, she and all Milledgeville employees received communications for and pays [sic] "salaried" retiree medical premiums. Retirees who receive their pension benefit based on their salary receive a more generous pension benefit and so pay higher medical contributions than their counterparts whose lower pension is based on a flat dollar amount per month per year of service from the pension program.

Enclosed with Ms. Lynch's letter was a copy of a retiree medical program authorization form signed by plaintiff in 1989, in which she had acknowledged that "she reviewed the current rates for coverage and that the rates for this coverage may change in the future."

On September 23, 1994, after filing suit in this matter, plaintiff's counsel requested documentation from Kendall's associate general counsel, David Siskind, clarifying plaintiff's change from hourly to salaried worker. The request was repeated in letter of October 24, 1994. On November 3, 1994, counsel provided plaintiff's counsel a copy of the inter-office

correspondence of May 25, 1989, as well as copies of correspondence advising Kendall retirees of the increases in their premium contributions.

On August 2, 1994, plaintiff filed the instant action alleging violations of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001–1461. On May 10, 1995, the parties filed a stipulation of facts in this matter. On June 25, 1995, plaintiff filed a motion for partial summary judgment on the issue of liability. On the same date defendant filed its motion for summary judgment. Responses have been filed to each party's motion, and the motions are now properly before the court. There is no issue of material fact in this case inasmuch as the parties have stipulated to the facts set out herein. Thus, the court must determine which party prevails as a matter of law.

## DISCUSSION

### I. Establishment of an ERISA Plan

The Employee Retirement Income Security Act of 1974 is a comprehensive federal statute which was designed to protect workers from the shortcomings of companies' private pension systems and which provides for minimum vesting, funding, and disclosure requirements as well as fiduciary requirements. With certain exceptions, ERISA applies to any employee benefit plan established or maintained by an employer engaged in commerce or in any or activity affecting commerce. 29 U.S.C. § 1003(a)(1).

An "employee welfare benefit plan" or "welfare plan" is defined under 29 U.S.C. 1002(1).[1] By statute, a "welfare plan" comprises the following elements:

> (1) a "plan, fund, or program" (2) established or main-tained (3) by an employer or by an employee organization, or by both, (4) for the purpose of providing medical, surgical, hospital care, sickness, accident, disability, death, unemployment or vacation benefits, apprenticeship or other training programs, day care centers, scholarship funds, prepaid legal services or sev-

---

[1]. Both welfare plans and pension plans are encompassed within the terms "employee benefit plan" or "plan." 29 U.S.C. § 1002(3). The definition of an "employee pension benefit plan" or "pension plan" is established in 29 U.S.C. § 1002(2)(A).

erance benefits (5) to participants or their beneficiaries.

*Donovan v. Dillingham,* 688 F.2d 1367, 1370 (11th Cir.1982). The parties herein agree that Kendall's Medicare Supplement Plan was a welfare plan under this definition and that ERISA governs its provisions. The vesting, participation, and funding requirements which apply to an ERISA pension plan are not applicable to welfare plans. *Alday v. Container Corp. of America,* 906 F.2d 660, 663 (11th Cir.1990). However, a welfare plan is subject to the reporting and disclosure requirements set out in 29 U.S.C. §§ 1021–1031 as well as the fiduciary standards set out in 29 U.S.C. §§ 1101–1114. *Id.* 29 U.S.C. § 1102(a)(1) requires that "every employee benefit plan shall be established and maintained pursuant to a written instrument." A written Plan is required in order that an employee may be able to determine exactly what his rights and obligations are under the Plan. See H.R.Rep. No. 93–1280, p. 297 (1974). In addition to the written Plan, 29 U.S.C. § 1022(a)(1) requires that a Summary Plan Description ("SPD") shall be furnished to participants and beneficiaries in accordance with § 1024(b). The SPD, along with any modification in the terms of the Plan, must be written in a manner calculated to be understood by the average plan participant and must be sufficiently accurate and comprehensive to reasonably apprise a participant or beneficiary of his rights and obligations under the Plan. See 29 C.F.R. § 2520.102–2(a). 29 U.S.C. § 1022(b) specifies the information which must be contained in the SPD. This information includes the name and type of administration of the plan; the name and address of the agent for service, administrator, and any trustee of the plan; the plan's requirements respecting eligibility for participation and benefits; the source of financing of the plan and the identity of any organization through which benefits are provided; the date of the end of the plan year and whether the records of the plan are kept on a calendar, policy, or fiscal year basis; and the procedures to be followed in presenting claims for benefits under the plan and the remedies available under the plan for the redress of denied claims.

The Summary Plan Description which Kendall furnished plaintiff consists of a booklet titled "Lifecare Medicare Supplement Plan." The booklet contains twenty-four pages of written text with a table of contents and provides additional pages at the end for notes. Under the heading "Taking Care of Yourself," it recites: "This Summary Plan Description (SPD) describes the Medicare Supplement Plan and explains how the Plan works. It tells you about choices you can make about your health care, and the many benefits available to you." Under the heading "Using Medical Services Wisely," the booklet provides:

It is important that you and your family understand the valuable medical benefits provided by Kendall. We all have a stake in using those benefits wisely. The following pages will describe our Medicare Supplement Plan and the many benefits, services, and resources that are available when you or your covered dependents need medical assistance.

Remember, this Summary Plan Description simply provides a summary of major plan provisions. The Plan is governed by a formal Plan document. ***Should a difference exist between the Summary Plan Description and the Plan Document, the Plan Document will govern. This document also summarizes Medicare provisions now in effect. Should a difference exist between this summary and Medicare policy, Medicare obviously governs. Given the contin-ually changing Medicare program, you should contact Medicare directly if you have questions about their program.*** [Emphasis in original.]

 Despite the above language purporting to warn retirees in bold italics that Kendall's formal ERISA Plan document governed the Medicare Supplement Plan and took precedence over the Summary Plan Description, Kendall concedes that in fact there is no formal Plan document in existence which amplifies upon any of the information contained in the SPD. Kendall's Summary Plan Description thus functions as both the formal Plan document and the SPD required by statute. The failure to provide two separate documents in accordance with the stat-

ute, however, does not defeat Kendall's duty to administer its Medicare Supplement Plan in accordance with the requirements of ERISA. *Donovan v. Dillingham,* 688 F.2d at 1372.

■ Under the heading "Premium Contributions" the SPD/Plan states:

> Your contributions toward the cost of coverage must be automatically deducted from your pension check each month. If your pension check is not sufficient to cover the premium contribution or if you received a lump sum pension payout, you can remit your payment to Aetna Life & Casualty directly. You will want to talk with your Human Resources Representative regarding payment options.

The only additional reference to premium contributions required for Plan participants is found under the heading "Continuation of the Plan":

> Kendall anticipates continuing the Medical Supplement Plan. To protect against any unforeseen situations, Kendall does reserve the right to change the Plan and, if necessary, to discontinue the Plan for all classes of participants. Contributions for coverage may change as well. Should this occur, changes in contributions may apply to all participants.

The information provided to Kendall retirees in the SPD/Plan falls short of satisfying ERISA's purpose of apprising the Plan's participants and beneficiaries of their rights under the Plan. Kendall's SPD contains neither a premium schedule specifying the amount of a retiree's obligations for contribution to the Plan nor reference to an alternative source or supplementary Plan document containing this vital information. No information is provided as to who will determine the contributory premium amount and upon what basis the determination will be made. The SPD/Plan simply requires the deduction of non-specified premium amounts from retirees' pension checks without providing specific information concerning the mandatory premium deductions.[2] Kendall affirms its

own right to change or terminate the Plan yet fails to fully advise employees of their corresponding rights and obligations. The SPD language referring to classes of participants is misleading because no further explanation or definition is made of classes of participants, which in fact did not exist at the time of plaintiff's retirement. Because of the misleading information or lack of information in the SPD, plaintiff was without a reliable document to enable her to determine the contours of the Medicare Supplement Plan for which premiums were deducted from her pension benefits each month. *See McKnight v. Southern Life and Health Insurance Co.,* 758 F.2d 1566, 1570 (11th Cir.1985). Kendall's failure to supply basic information concerning either premium obligations or classes of participants violated Section 1022(a)(1) by not adequately informing plaintiff of her rights under the Medicare Supplement Plan.

## II. Amendment

■ An ERISA plan administrator must furnish a summary of any material modification in the Plan to each participant. 29 U.S.C. § 1022(a)(1). Any modification or amendment to an existing ERISA plan may not be adopted or applied, however, unless the amendment is adopted in a formal, complete, and written form. *Smith v. National Credit Union Administration Board,* 36 F.3d 1077 (11th Cir.1994). In *Smith,* the Credit Union Board had orally approved amendments to the company's employee pension plan in 1989 and had posted notices in 1989 and in 1990 advising employees of the changes. In 1990 the Board again reaffirmed the amendments it had previously orally approved, and in 1991 a Credit Union officer signed a backdated restatement of the pension plan which contained the amendments.

The *Smith* court held that the amendments were not effective until the date in 1991 that they were formally adopted in written form. The Credit Union's attempted earlier notification to employees by the posting of notices was invalid because the employees were precluded from determining

---

2. By contrast, the SPD sets out specific dollar amounts with respect to lifetime limitations for hospital and inpatient services, limitations for

surgical benefits, copayments for prescription drugs, and deductibles.

their rights and obligations at the time of the oral amendments. *Id.* at 1081. Changes made to the company's savings plan in 1989 were also held not to be effective until the date in 1992 when they were formally executed. Reaffirming its earlier holding in *Nachwalter v. Christie,* 805 F.2d 956 (11th Cir. 1986), the Court held that ERISA prohibits not only oral modifications but also *informal written amendments* of employee benefit plans. Thus, "any modification or amendment to an ERISA plan can be implemented or applied only *after* the amendment has been appropriately adopted in a formal, complete and written form." *Smith,* 36 F.3d at 1081.

Kendall's classification of its retirees into two separate categories required to pay differing premium amounts was not adopted in "formal, complete and written form." The changes were memori-alized only in the informal inter-office correspondence of May 25, 1989. Nevertheless, Kendall argues that the requirements of *Smith* are inapplicable to the present case because of the Supreme Court's ruling in *Curtiss-Wright Corporation v. Schoonejongen,* — U.S. —, 115 S.Ct. 1223, 131 L.Ed.2d 94 (1995). This argument is not persuasive. The issue in *Curtiss-Wright* concerned the interpre-tation of 29 U.S.C. § 1102(b)(3), which requires an ERISA plan to provide a procedure for amending a Plan and to identify persons possessing authority to amend. The Supreme Court held that the standard language in *Curtiss-Wright's* ERISA plan providing that "The Company reserves the right at any time to amend the plan" was sufficient to satisfy 29 U.S.C. § 1102(b)(3) with respect to identifying both "a procedure" and "persons" with authority to amend. The Court held that principles of corporate law are sufficient to identify the individuals within a Company who actually possess amendment authority; thus, it is not necessary to identify specific individuals in the plan. The Court also held that the standard reservation clause satisfied the requirement to provide a procedure for identifying the plan because "It says the plan may be amended by a unilateral company decision to amend, and only by such a decision—and not, for example, by the unilateral decision of a third-party trustee or upon the

approval of the union." *Curtiss-Wright,* — U.S. at —, 115 S.Ct. at 1229, 131 L.Ed.2d at 101.

The parties do not argue that in the present case Kendall lacks authority to amend its Medicare Supplement Plan by utilizing proper procedures in accordance with the requirements of ERISA and corporate law principles. A company retains the right under ERISA to amend or terminate a welfare benefits plan. *Id.* at —, 115 S.Ct. at 1228, 131 L.Ed.2d at 100, citing *Adams v. Avondale Industries,* 905 F.2d 943 (6th Cir. 1990). *See also Alday,* 906 F.2d at 665. The issue in the present case is not whether Kendall had authority to amend its plan by proper corporate procedures but whether its proposed amendment to the SPD/Plan was properly adopted. *Smith* makes it clear that in the Eleventh Circuit an amendment to an ERISA plan will not be deemed to be properly adopted unless it is adopted in "formal, complete and written form."

The court has been referred to no corporate law principle to the effect that the internal distribution of inter-office correspondence is sufficient to constitute formal amendment of an ERISA Plan. Nevertheless, Kendall argues that "when the Plan was amended effective September 1, 1989, the terms of the Plan were contained in the SPD/Plan and the premium notices. For each year thereafter, the Plan terms consist of the Plan and each year's premium notices. The proper corporate officers set the required premium rates each year and communicate that information to participants." Kendall's argument ignores the fact that the "amendment" purportedly effective on September 1, 1989, was not an amendment at all under *Smith* since it was never formally adopted. Kendall's ERISA plan is contained wholly within its Summary Plan Description which also functions as its Plan documents. Since the inter-office correspondence purporting to establish the two-tiered classification and premium contribution system for employees was not in existence when the Medicare Supplement Plan was adopted, the inter-office correspondence cannot be construed as a written document partially comprising Kendall's ERISA plan. The establishment of the two classes of retir-

ees was a material modification to the Plan. As such, ERISA requires that it be both formally adopted in written form and properly communicated to Plan participants. Kendall, therefore, was not entitled to implement or apply its two-tiered schedule for insurance premium contributions. *Smith*, 36 F.3d at 1081.

Accordingly, plaintiff Mohalley is entitled to a refund of the excess premium amounts she paid from September 1, 1989, and is entitled to continued coverage at the rate for "hourly" employees until such time as all the requirements of ERISA are deemed to have been met with respect to amendment and notification.

### III. Reporting and disclosure

29 U.S.C. § 1024(b)(1) mandates:

> The administrator shall furnish to each participant, and each beneficiary receiving benefits under the plan, a copy of the summary, plan description, and all modifications and changes referred to in section 1022(a)(1) of this title—
>
> (A) within 90 days after he becomes a participant, or (in the case of a beneficiary) within 90 days after he first receive benefits, or
>
> (B) If later, within 120 days after the plan becomes subject to this part.
>
> . . . . .
>
> If there is a modification or change described in section 1022(a)(1) of this title, a summary description of such modification or change shall be furnished not later than 210 days after the end of the plan year in which the change is adopted to each participant, and to each beneficiary who is receiving benefits under the plan.

■ Kendall failed to provide plaintiff with notice of the modification of the Plan/SPD which created two classes of retirees, in violation of its statutory obligations. Nor did Kendall comply with its further obligation to provide plaintiff with information upon her specific request. 29 U.S.C. § 1024(b)(4) requires that:

> The administrator shall, upon written request of any participant or beneficiary, furnish a copy of the latest updated summary plan description, plan description, and the latest annual report, any terminal report, the bargaining agreement, trust agreement, contract, or other instruments under which the plan is established or operated. The administrator may make a reasonable charge to cover the cost of furnishing such complete copies....

Plaintiff first became aware of Kendall's decision to consider all McGaw employees as salaried employees for health care billing purposes when she became aware that although she had been an hourly employee she was being billed for the Medicare Supplement Plan premiums at the rate for salaried employees. Although there was an exchange of various letters between plaintiff, Kelly Lynch, plaintiff's retained counsel, and Kendall's associate general counsel, the requested documentation was not provided until November 3, 1994, when Kendall's attorney provided it to plaintiff's attorney after the commencement of this litigation. Kendall argues that the only essential information it was required to furnish to plaintiff was the premium amount required for participation in the Plan. The Court does not agree. The creation of eligible retirees into two classes was essential Plan information which was required to be communicated to participants under both Sections 1024(b)(1) and (4). The failure to disclose the creation of the classes to plaintiff was a clear violation of ERISA. Kendall's argument that it satisfied its obligations under ERISA by notifying plaintiff of the premium amount which would be deducted from her pension benefits is unavailing.

### A. Statutory penalties

■ Statutory penalties are provided for the failure or refusal to furnish information upon request to a participant or beneficiary. 29 U.S.C. § 1132(c) provides:

> Any administrator who fails or refuses to comply with a request for any information which such administrator is required by this subchapter to furnish to a participant or beneficiary ... by mailing the material requested to the last known address of the requesting participant or beneficiary within 30 days after such request may in the

court's discretion be personally liable to such participant or beneficiary in the amount of up to $100 a day from the date of such failure or refusal, and the court may in its discretion order such other relief as it deems proper.

In cases alleging reporting and disclosure violations, a plaintiff must sue under Section 1132(a)(1)(A) for the relief provided in Section 1132(c). *Welsh v. GTE Service Corporation,* 866 F.Supp. 1420 (N.D.Ga.1994), citing *Hozier v. Midwest Fasteners,* 908 F.2d 1155, 1167 (3rd Cir.1990). In determining whether plaintiff is entitled to a statutory award because of Kendall's failure to notify her of the new classification system, the court may consider whether Kendall's failure to provide the requested information prejudiced the plaintiff. However, prejudice in the form of monetary loss is not a prerequisite to an award of civil penalties. *Curry v. Contract Fabricators,* 891 F.2d 842, 847 (11th Cir.1990). The civil penalty "is in the nature of punitive damages designed more to punish the intransigent administrator and to teach ERISA fiduciaries a needed lesson than to compensate the pensioner for actual loss." *Sandlin v. Iron Workers District Council Pension Plan,* 716 F.Supp. 571, 574 (N.D.Ala.1988), *aff'd,* 884 F.2d 585 (11th Cir.1989). Relevant to the court's decision whether statutory penalties are warranted in this case is whether Kendall intentionally or deliberately withheld information regarding the two-tiered premium schedule from plaintiff or was simply negligent in failing to produce written documentation of the two classes of retirees and the premium amounts required for each. It is also relevant whether the company believed in good faith that notifying plaintiff of the revised premium schedules was sufficient to comply with the statute. Based upon an initial consideration of these factors, the court finds that a statutory penalty is warranted in this case. A ruling on the appropriate amount of statutory penalties will be reserved for ruling after consideration of additional arguments of counsel.

### B. Substantive relief

■ In addition to the statutory relief provided in Section 1132(c), a plaintiff may under certain circumstances be entitled to substantive relief as a result of an employer's violations of ERISA. Ordinarily violations of ERISA's procedural requirements will not entitle a plaintiff to substantive relief. *Harris v. Pullman Standard,* 809 F.2d 1495, 1499 (11th Cir.1987). However, if a company's interpretation and implementation of its policy prove it has acted arbitrarily and in bad faith, then the quality of the employer's procedural violations may cause a substantive harm. *Id.* at 1499, citing *Blau v. Del Monte Corp.,* 748 F.2d 1348 (9th Cir.1984). The substantive harm worked in *Harris* was that in addition to violating the procedural requirements of ERISA the company had denied its employees severance pay contrary to the clear terms of its severance benefits policy, had established conditions precedent to the employees' right to receive severance pay which were not set out in the policy, and had inconsistently interpreted its benefits plan. *Harris,* 809 F.2d at 1498–99. Thus, the company was found to have acted arbitrarily and in bad faith, entitling the plaintiffs to an award of severance pay.

■ The Fifth Circuit has held that an amendment to a welfare benefit plan is valid despite a beneficiary's lack of personal notice unless the beneficiary can show (1) active concealment of the amendment, (2) significant reliance upon, or (3) possible prejudice from the lack of notice. *Wise v. El Paso Natural Gas Co.,* 986 F.2d 929, 936 (5th Cir.), *cert. denied,* —— U.S. ——, 114 S.Ct. 196, 126 L.Ed.2d 154 (1993), quoted in *Welsh v. GTE Service Corp.,* 866 F.Supp. 1420, 1426 (N.D.Ga.1994). In the case sub judice the court has held that Kendall's amendment to its welfare benefit plan was invalid because it was not formally adopted and that plaintiff is entitled to a refund of excess premiums on this basis. Thus, Kendall is not entitled to claim on alternative grounds that the two-tiered classification of retirees is valid despite the lack of notification to plaintiff. On the other hand, the court cannot rule at this stage that plaintiff's being required to pay higher insurance premiums was sufficient prejudice to entitle her to the substantive remedy of being permanently classified as an hourly employee for purposes of the Medicare Supplement Plan. Kendall maintains that the two-tiered classification system was warranted because McGaw hourly employees

derived the benefits of a salaried employee under Kendall's pension plan and that "[b]eing considered salaried was advantageous in respect to short-term disability, long-term disability and the pension plan." The designation of an hourly employee as a salaried employee for welfare benefits purposes appears arbitrary on its face. Nevertheless, it cannot be determined from the record whether such classification, with its concomitant larger insurance premiums, could be justified by the greater pension benefits paid to McGaw employees and that the confusion from the designation could be resolved by the use of an appropriate description other than "salaried" to designate McGaw employees required to pay a higher premium amount than other hourly employees. The court will reserve a finding on plaintiff's entitlement to substantive relief until arguments of counsel have been considered on the appropriateness of Kendall's classification scheme.

### IV. Conclusion

Accordingly, plaintiff's motion for partial summary judgment on liability is GRANTED. Defendant's motion for summary judgment is DENIED. The question of the appropriate statutory and substantive remedies to which plaintiff is entitled are reserved for later consideration.

**SO ORDERED.**